**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO: 26-** |
| **v.** | : | **DATE FILED: ____________** |
| **DAVID DINENBERG** | : | **VIOLATIONS:** |
| | | **15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R.** |
| | : | **§ 240.10b–5 (securities fraud – 1 count)** |
| | | **18 U.S.C. § 1343 (wire fraud - 4 counts)** |
| | : | **Notice of forfeiture** |

**INFORMATION**

**COUNT ONE**
**(Securities Fraud)**

**THE UNITED STATES ATTORNEY CHARGES THAT:**

**General Overview**

1. Defendant DAVID DINENBERG grew up in, and is currently a resident of Lower Merion Township, in the Eastern District of Pennsylvania.

2. In or around 2013, defendant DAVID DINENBERG established KindManage, LLC ("KindManage" or "Kind"), for the purpose of providing payment processing and related services to cannabis growers and distributors in states that had authorized, or were on the verge of authorizing, marijuana sales for medicinal and/or recreational purposes.

3. From in or around April 2014 until in or around April 2023, defendant DAVID DINNENBERG fraudulently induced dozens of people into buying shares of Kind and/or affiliated entities by: (a) making false representations about Kind's revenues, valuations, and business prospects; and by (b) misleading the investors into believing that their entire investments were being used for the benefit of Kind, when the reality was that defendant

DINENBERG embezzled more than a half-million dollars from Kind and used it to pay for unauthorized personal expenditures, such as his sons' college tuitions, rent in a luxurious California home, and country club memberships.

4. In total, defendant DAVID DINENBERG defrauded these investors out of more than $8.8 million.

5. Defendant DAVID DINENBERG also used Kind to essentially steal approximately $175,000 from the State of Rhode Island.

**The Creation of Kind and Its Affiliates**

6. In or around 2012, defendant DAVID DINENBERG learned about a problem faced by marijuana growers and sellers in states that had purported to "legalize" certain cannabis sales and use, notwithstanding the fact that federal law continued to criminalize such conduct. Specifically, defendant DINENBERG learned that banks were refusing to do business with cannabis-based business entities because the federal prohibition against marijuana sales remained in effect. As a result, the marijuana growers and dispensaries in those states engaged almost exclusively in cash transactions, which left them vulnerable to robberies and other violent crimes.

7. Defendant DAVID DINENBERG sought to create a business that would process non-cash transactions for cannabis purchases, but he needed funding for this business.

8. In or around 2013, defendant DAVID DINENBERG was introduced by a business connection ("Connection 1") to a lawyer in Washington, D.C., and a group of young investors ("Investor Group 1"), who agreed to invest approximately $300,000 to support defendant DINENBERG's planned business in return for an ownership stake in that entity.

9. On or about June 24, 2013, defendant DAVID DINENBERG, with the help of his new lawyer, registered KindManage as a New York limited liability company with a principal place of business in Washington, D.C.

10. Shortly thereafter, defendant DAVID DINNENBERG registered two other limited liability companies with the Pennsylvania Department of State: SoKind, LLC ("SoKind"), and MaxBen, LLC ("MaxBen"). Defendant DINENBERG was identified as the sole owner of MaxBen, and MaxBen was identified as the majority owner of SoKind.

11. On or about December 19, 2013, SoKind, Investor Group 1, and Connection 1 entered into an Operating Agreement for KindManage, which provided, among other things, that SoKind would own 50 percent of KindManage; Investor Group 1 would own 47 percent of the company; and Connection 1 would own the other 3 percent of the company.

**Dinenberg's Replacement of Investor Group 1 with Investor Group 2**

12. In 2014, defendant DAVID DINENBERG decided to hire two old friends, each of whom is known to the United States Attorney, to work for Kind ("Executive 1" and "Executive 2", respectively).

13. Executive 1 agreed to make two $100,000 investments in SoKind – one in April 2014 and one in September 2014 – in exchange for ownership interests in SoKind. Executive 2 also would eventually acquire an ownership interest in SoKind as well, as did a man who had met defendant DAVID DINENBERG through a family connection ("Executive 3"), who is known to the United States Attorney. All three of these men ultimately became executives of Kind.

14. Also in 2014, defendant DAVID DINENBERG decided that he did not like his arrangement with Investor Group 1, so he sought new investors who could help him buy

out Investor Group 1's interest in Kind. To that end, defendant DINENBERG issued a news release about Kind, and it attracted the attention of a well-known and well-connected member of the Philadelphia business community known to the United States Attorney ("Connection 2").

15. Connection 2 introduced defendant DAVID DINENBERG to several wealthy investors who were sympathetic to the cause of marijuana legalization. Defendant DINENBERG told these investors about his plan to provide payment processing and related services to the cannabis industry, and the investors agreed to purchase shares in Kind.

16. In September 2014, defendant DAVID DINENBERG, acting individually and through SoKind, agreed to buy out Investor Group 1's interest in KindManage for approximately $600,000.

17. In October 2014, defendant DAVID DINENBERG, acting through SoKind, agreed to buy out Connection 1's interest in KindManage for approximately $38,297.

18. Also in October 2014, defendant DAVID DINENBERG filed a series of legal documents, which converted KindManage, LLC from a New York limited liability company into a Delaware limited liability company. The Delaware version of KindManage is referred to herein as "Kind."

19. On or about December 12, 2014, defendant DAVID DINENBERG, on behalf of SoKind, executed a Limited Liability Company Agreement for Kind with a group of five new investors and Connection 2. This agreement stated that the purpose of Kind was to: "act as a Merchant Service Business to, directly or indirectly invest in, lend to and/or finance, companies engaged in, the cannabis and/or medical marijuana industries." The agreement also identified defendant DINENBERG as the initial "manager" of Kind with certain responsibilities to oversee the operations of the company, but it provided that defendant DINENBERG "shall not

be entitled to compensation for serving as manager." Instead, defendant DINENBERG would be "entitled to reimbursement for reasonable third party expenses (but not overhead expenses) incurred in managing the Company." The agreement also identified capital contributions made to Kind by each of the five new investors.

20. The Limited Liability Company Agreement was amended on or about January 28, 2015, to make minor adjustments to the list of investors and amounts of their investments. The amended agreement identified five investors, all of whom are known to the United States Attorney ("Investor Group 2"), who had invested a total of $1,050,000 in Kind: Investor A, who had invested $500,000; Investor B, who had invested $250,000; and Investors C, D, and E, each of whom had invested $100,000.

21. In return for their investments, Investor A received a 16.17 percent stake in Kind; Investor B received an 8.34 percent stake in Kind; and Investors C, D, and E each received a 3.33 percent stake in the company. Connection 2 also received a 1 percent stake in Kind as compensation for connecting defendant DAVID DINENBERG with Investor Group 2. SoKind retained a 64 percent stake in Kind.

22. In or around the Spring of 2015, defendant DAVID DINENBERG induced Investors A, B, and C to invest an additional $560,000 in Kind in return for larger ownership stakes in Kind. These additional investments increased the total amount of money that Investor Group 2 had invested in Kind to $1,610,000.

23. The new investments and their effects on the ownership interests in Kind were memorialized in a First Amended and Restated Limited Liability Company Agreement for Kind, which was executed on or about June 2, 2015, by defendant DAVID DINENBERG, on behalf of SoKind, and Investor A, on behalf of Investor Group 2.

24. Each investor in Investor Group 2 expected defendant DAVID DINENBERG to use their investments to develop and grow Kind's business and not to pay for defendant DINENBERG's personal expenses.

25. Unbeknownst to these investors, defendant DAVID DINENBERG diverted some of the money they had invested in Kind into defendant DINENBERG's personal bank accounts and used those funds to pay for personal expenses, including rent for a $7,500-a-month home in southern California, membership in an exclusive country club, and private school tuition for his two sons.

**Kind's Business Activities Between 2015 and 2019**

26. As of June 2015, Kind had only a handful of employees: defendant DAVID DINENBERG, his sister-in-law, and Executives 1, 2, and 3. Kind did not employ a professional accountant, and defendant DINENBERG hired one of his aunts to prepare Kind's tax returns.

27. Kind also had not taken any real steps to provide payment processing services for cannabis dispensaries, but it had started working with other cannabis industry businesses.

28. On or about June 12, 2015, Kind acquired a Colorado-based technology company called Agrisoft Development Group ("Agrisoft"), which had developed a technology platform that could track marijuana plants from "seed" to "sale." Agrisoft had a handful of customers, consisting of dispensaries, growers, and processors that were located in Colorado and the few other states that had legalized some marijuana usage, but it was struggling financially. Each of these clients paid a monthly licensing fee to Agrisoft, so there was some revenue associated with the company, but it was not much.

29. After Kind acquired Agrisoft, defendant DAVID DINENBERG parlayed that arrangement into a more important agreement with Microsoft Corp. ("Microsoft"). Connection 2 introduced defendant DINENBERG to executives at Microsoft, and in or around June 2016, Kind entered into a partnership with Microsoft to develop software that could help states that had "legalized" some marijuana use track and regulate licensed marijuana sales. This partnership generated national media attention.

30. Kind's deal with Microsoft gave it immediate credibility with other cannabis industry businesses and with state governments looking to regulate marijuana sales. Kind bid for contracts with Rhode Island, Delaware, and Puerto Rico to trace marijuana inventories and track sales within those states. Kind did not win the contracts with Puerto Rico or Delaware, but on or about December 29, 2016, Kind entered into a contract with the State of Rhode Island to provide a tagging system for managing marijuana sales within the state.

31. Under this contract, marijuana growers in Rhode Island would pay Kind for identification tags to place on their marijuana plants. Each tag cost $25, and Kind was supposed to collect those fees and remit them to Rhode Island governmental officials. For its trouble, Kind was entitled to receive a fee of $2.50 per transaction. Kind began collecting these tag fees in March 2017 and continued doing so through 2022

32. Kind's contract with Rhode Island was not particularly lucrative. For example, in 2017, Kind collected approximately $522,817 from Rhode Island marijuana farmers for plant identification tags, but Kind remitted approximately $517,142 of that amount to Rhode Island government officials and retained only approximately $5,575 of those fees. Similarly, in 2018, Kind retained approximately $7,610 of the plant tag fees that it had collected from Rhode Island marijuana farmers, and in 2019, Kind retained approximately $12,289 in these fees.

33. In short, Kind generated very little revenue between 2015 and 2019.

34. During this time period, Kind was operating almost exclusively on the funds that defendant DAVID DINENBERG had raised from investors, and defendant DINENBERG was continuing to divert much of this money to his and his wife's personal bank accounts without the knowledge of the investors, executives, or employees of Kind.

35. At the same time, defendant DAVID DINENBERG caused Kind to reduce and then eliminate the compensation paid to most of its executives and employees. Defendant DINENBERG also caused Kind to stop paying its legal bills and to stop paying federal and state agencies money that been withheld from the paychecks of Kind's employees for the purpose of paying federal and state taxes, Social Security, Medicare, and other governmental programs.

**<u>Dinenberg's Fraudulent Representations to New and Existing Investors</u>**

36. Defendant DAVID DINENBERG hid Kind's financial struggles from the other shareholders in Kind and SoKind and instead sought to raise additional funds from new and existing investors. Using his own contacts and introductions from Connection 2 and a well-connected childhood friend ("Connection 3"), a person known to the United States Attorney, defendant DINENBERG contacted Hollywood celebrities, retired athletes, models, sports team coaches and executives, and others, and solicited investments in Kind from them.

37. To entice these people to invest in Kind, defendant DAVID DINENBERG provided them with glossy and professional-looking PowerPoint presentations that appeared to contain detailed financial statements that looked like they had been prepared by legitimate accountants based on actual corporate records. In actuality, Kind did not have an accountant, and the financial statements were unaudited and filled with false representations by defendant

DINENBERG about Kind's revenues, future revenue projections, and business prospects, as well as baseless valuations of the company.

38. For example, in one PowerPoint that defendant DAVID DINENBERG disseminated to existing and potential new investors in or around July 2016, defendant DINENBERG represented that revenues for the last five months of 2016 were expected to be $431,947 and then increase to $10,219,145 in 2017 and $39,770,657 in 2018; and there was no factual basis for any of these representations.

39. Similarly, in April 2017, defendant DAVID DINENBERG provided existing and potential new investors with financial statements for Kind that characterized the tag fees that Kind had collected from the first year of its Rhode Island contract as "revenues" for the first quarter of 2017, even though Kind was simply transmitting most of those fees ($25 out of every $27.50) to the Rhode Island state government. After seeing a draft of these statements, Executive 3 sent an email to defendant DINENBERG stating that the tag fees were not "revenues" and should not be characterized as such, but defendant DINENBERG kept the misleading representation in the materials he provided to existing and potential new investors.

40. Likewise, after Executive 3 provided defendant DAVID DINENBERG with drafts of profit and loss statements and other financial documents for Kind, defendant DINENBERG doctored those records to make Kind appear more profitable than it actually had been.

41. Defendant DAVID DINENBERG also lied to existing investors at investor meetings by saying that Kind was obtaining additional contracts with additional states, which would generate additional revenues in future years.

42. Defendant DAVID DINENBERG also provided existing and potential new investors with baseless valuations of Kind, which ranged from $3 million in 2014 to $35 million by 2017.

43. In some instances, defendant DAVID DINENBERG told potential investors that he would allow them to buy discounted shares of defendant DINENBERG's own stock in Kind through MaxBen. Whenever an investor purchased those shares, the money went directly into defendant DINENBERG's personal bank accounts.

**KindPay and Hartstreet Holdings**

44. In or around 2019, defendant DAVID DINENBERG actually made some progress toward achieving his original goal of providing payment processing services to cannabis dispensaries when he entered into an agreement with an investment group called Hartstreet Holdings, LLC ("Hartstreet").

45. Under this agreement, Hartstreet would invest approximately $2.25 million in Kind and help Kind develop and market an app called "Kind Pay" that would work like Zelle and PayPal and allow for non-cash transactions at dispensaries. In return, Hartstreet would receive a 35 percent stake in Kind and would acquire all of Kind's existing intellectual property.

46. Shortly after executing this agreement, defendant DAVID DINENBERG told Kind's existing investors about the main aspects of the deal with Hartstreet, but defendant DINENBERG hid the fact that he had agreed to transfer all of Kind's intellectual property to Hartstreet.

47. Hartstreet brought in Herring Bank to help develop and support the KindPay app. Herring Bank was using MasterCard to facilitate the transactions, and for a little

while in 2020 and 2021, KindPay was working, and some dispensaries even had KindPay kiosks to facilitate on-site, non-cash sales of marijuana.

48. That success, however, was short-lived. In early 2021, MasterCard learned that KindPay was being used for marijuana sales, and it refused to provide support for future transactions.

49. Neither Hartstreet nor Kind ever found a replacement for Herring Bank.

**Dinenberg's Embezzlement from Kind and his Resignation**

50. From the inception of Kind, defendant DAVID DINENBERG had access to and control over all of Kind's bank accounts.

51. Between 2016 and 2019, defendant DAVID DINENBERG used his control over Kind's bank accounts to transfer approximately $204,000 from Kind into accounts in the name of defendant DINENBERG's wife, even though defendant DINENBERG's wife did not work for Kind.

52. Additionally, between 2020 and 2023, defendant DINENBERG transferred more than $551,000 from Kind's bank accounts to his personal bank accounts. Defendant DINENBERG then used those funds to pay for personal expenditures, such as residential rent, groceries, and his college tuition payments for his two sons.

53. In or about April 2023, Executive 1 gained access to some of Kind's bank records and saw that defendant DAVID DINENBERG had been embezzling money from the company. Executive 1 confronted defendant DINENBERG about the embezzlement.

54. Defendant DAVID DINENBERG acknowledged that he had stolen some of Kind's money and used it for personal expenditures, but he claimed that the total was only about $80,000.

55. Defendant DAVID DINENBERG separately told Investor A that he had been using Kind funds to pay for his sons' tuitions and other personal expenses for years.

56. On or about May 4, 2023, defendant DAVID DINENBERG submitted a one-paragraph letter, in which he resigned from all positions he held at Kind, SoKind, MaxBen, and their affiliates.

**Summary**

57. In total, defendant DAVID DINENBERG induced at least 53 different investors to invest a total of approximately $8,872,073.12 in Kind, SoKind, and MaxBen between April 1, 2014, and April 25, 2023.

58. All of these investors relied on representations by defendant DAVID DINENBERG that their money would be used in the best interests of Kind, SoKind, and MaxBen. None of these investors authorized defendant DAVID DINENBERG to use their money to pay for his sons' college tuitions and other purely personal expenses.

59. Some of these investors agreed to invest in Kind, SoKind, and MaxBen only because of the representations that defendant DAVID DINENBERG had made to them about Kind's revenues, value, and business prospects.

60. All of these investors lost their entire investments in Kind, SoKind, and MaxBen.

**THE SECURITIES FRAUD SCHEME**

61. From at least in or about 2014, through at least in or about April 2023, in the Eastern District of Pennsylvania and elsewhere, defendant

**DAVID DINENBERG**

unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, used and employed manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b–5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in connection with the purchase and sale of securities of KindManage, LLC, SoKind, LLC, and MaxBen, LLC.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b–5, and Title 18, United States Code, Section 2.

**<u>COUNTS TWO THROUGH FOUR</u>**
**(Wire Fraud Against Investors)**

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 60 of Count One are incorporated here.

**THE SCHEME TO DEFRAUD**

2. From in or about 2018 through at least in or about October 2020, in the Eastern District of Pennsylvania and elsewhere, defendant

**DAVID DINENBERG**

devised and intended to devise a scheme to defraud investors, prospective investors, and employees of Kind, SoKind, and MaxBen, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

**MANNER AND MEANS**

It was part of the scheme that:

3. Defendant DAVID DINENBERG made misrepresentations to investors, prospective investors, and employees about Kind's revenues, financial condition, valuation, and business prospects in order to induce investors and potential investors to make investments in Kind, SoKind, and MaxBen.

4. Defendant DAVID DINENBERG made misrepresentations to investors and prospective investors in Kind, SoKind, and MaxBen, about how their investments would be used. Specifically, defendant DINENBERG represented that their entire investments would be used in the best interests of the companies, when in reality, defendant DINENBERG converted some of the money from their investments to his personal use.

**THE WIRE TRANSMISSIONS**

5. On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, having devised and intending to devise this scheme, defendant

**DAVID DINENBERG**,

for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate and foreign commerce the signals and sounds described below, each transmission constituting a separate count:

| COUNT | APPROXIMATE DATE (AND TIME) | DESCRIPTION |
|---|---|---|
| 2 | November 5, 2021 | An audio and video transmission of a presentation that defendant DAVID DINENBERG made from California to shareholders of KindManage, LLC, located in the Eastern District of Pennsylvania and elsewhere, during which defendant DINENBERG falsely and intentionally inflated the company's revenues. |
| 3 | November 2, 2022 | A wire transfer of $6,368, that defendant DAVID DINENBERG, located in California, caused to be made from a Bank of America bank account ending in x2375 to Temple University in Philadelphia, in the Eastern District of Pennsylvania, after passing through servers located in Virginia and Texas. |
| 4 | December 3, 2022 | An email that defendant DAVID DINENBERG, located in California, transmitted to dozens of investors in KindManage, LLC, who were located in the Eastern District of Pennsylvania and elsewhere, in which defendant DINENBERG made multiple false representations about the company's business prospects. |

All in violation of Title 18, United States Code, Section 1343.

## COUNT FIVE
### (Wire Fraud Against the State of Rhode Island)

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 60 of Count One are incorporated here.

2. From approximately March 2017 until approximately 2022, Kind collected fees from Rhode Island marijuana growers, pursuant to a contract that Kind had executed with the state of Rhode Island on or about December 29, 2016.

3. Under the terms of that contract, Rhode Island marijuana growers were supposed to pay $25 to Kind for identification tags to place on their marijuana plants, along with a $2.50 fee, and Kind was required to remit the $25 fees to a Rhode Island government agency.

4. From 2017 through 2019, Kind complied with the terms of the contract, but starting in or around 2020, defendant DAVID DINENBERG caused Kind to retain nearly all of the tag fees that had been collected from the Rhode Island marijuana growers instead of remitting those fees to the Rhode Island government.

5. For example, in 2020, Kind collected approximately $171,300 in tag fees from Rhode Island marijuana growers and retained approximately $132,094 of those fees.

6. Similarly, in 2021, Kind collected approximately $198,097 from Rhode Island marijuana growers and retained approximately $130,446 of those fees.

7. Defendant DAVID DINENBERG controlled the bank accounts for Kind into which the tag fees had been transmitted by the Rhode Island marijuana growers. In 2020 and 2021, defendant DINENBERG stopped remitting most of the fees to the Rhode Island government. Instead, defendant DINENBERG diverted the funds to his personal bank accounts and used them to pay for personal expenses.

8. Kind's retention of these tag fees apparently went unnoticed by Rhode Island government employees for some time, but in early 2022, officials within Rhode Island's government reached out to defendant DAVID DINENBERG in an attempt to collect the unremitted fees.

9. Defendant DAVID DINENBERG told a series of lies to the Rhode Island governmental officials to delay and ultimately avoid having to pay back the money that Kind owed to the state of Rhode Island for the tag fees.

10. For example, on or about February 7, 2022, after receiving an email inquiry from a Rhode Island official about the unremitted tag fees, defendant DAVID DINENBERG assured the official that the payment would be made shortly and asked for wiring instructions, even though Kind had previously wired money to Rhode Island and did not need new wiring instructions.

11. On or about March 2, 2022, in response to a subsequent email from the same Rhode Island official, defendant DAVID DINENBERG wrote that Executive 3 at Kind had sent everything relating to the payment to Kind's "bookkeeper." In reality, as defendant DINENBERG knew, Executive 3 no longer worked at Kind, having left the company in 2021, and Kind did not employ a "bookkeeper."

12. Then, on or about March 9, 2022, in response to another email inquiry from the same Rhode Island official, defendant DAVID DINENBERG purported to forward that email to a "Sam" at an email address of accounting@kind.financial and asked "Sam" to provide a "hard date" on when Kind would make a payment of the tag fees to Rhode Island. Defendant DINENBERG copied the Rhode Island official on his email to "Sam" at

accounting@kind.financial. In reality, as defendant DINENBERG knew, Kind did not have any employees named Sam or even an accounting department.

13. Kind never paid any more tag fees to the state of Rhode Island.

14. In total, defendant DAVID DINENBERG, through Kind, deprived the state of Rhode Island of at least $175,000 that it was owed in marijuana plant tag fees.

**THE SCHEME TO DEFRAUD**

15. From in or about 2020 through in or about 2023, in the Central District of California, the District of Rhode Island, and elsewhere, defendant

**DAVID DINENBERG**

devised and intended to devise a scheme to defraud the state of Rhode Island and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

**MANNER AND MEANS**

It was part of the scheme that:

16. Defendant DAVID DINENBERG knew that under Kind's contract with the state of Rhode Island, Kind was obligated to remit to government officials in Rhode Island $25 out of every $27.50 that it collected from Rhode Island marijuana growers, but defendant DINENBERG knowingly and intentionally refused to remit those payments in 2020 and 2021.

17. Defendant DAVID DINENBERG repeatedly lied to Rhode Island governmental officials in emails in response to inquiries about the unremitted tag fees.

18. On or about March 9, 2022, in the Central District of California, the District of Rhode Island and elsewhere, defendant

**DAVID DINENBERG**,

for the purpose of executing the scheme described above, knowingly caused to be transmitted by means of wire communication in interstate commerce an email in which defendant DINENBERG purported to ask “Sam” at an email address of accounting@kind.financial to provide a “hard date” on when Kind would make remittance payments to the state of Rhode Island.

All in violation of Title 18, United States Code, Section 1343.

**NOTICE OF FORFEITURE**

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. As a result of the violations of Title 15, United States Code, Section 78ff, and Title 18, United States Code, Section 1343, defendant

**DAVID DINENBERG**

shall forfeit to the United States of America any property which constitutes or is derived from proceeds traceable to the commission of such offenses, including, but not limited to the sum of $9,047,073.12.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of this Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461.

/FOR

**DAVID METCALF**
**UNITED STATES ATTORNEY**

*No.*_ _ _ _ _ _ _ _ _ _ _

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

Criminal Division

THE UNITED STATES OF AMERICA

vs.

**DAVID DINENBERG**

INFORMATION

Counts

**15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b–5 (securities fraud – 1 count) 18 U.S.C. § 1343 (wire fraud – 4 counts)**
**Notice of forfeiture**

A true bill.

_______________________________________

Foreperson

Filed in open court this ________________________________day,
Of _______________________A.D. 20____________

_______________________________________

Foreperson

Bail, $_________________